IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ANDREA THOMAS,                                    No. 3:15-cv-01375-HZ

        Plaintiff,

    v.

UNION PACIFIC RAILROAD COMPANY,                   OPINION & ORDER
a Delaware corporation,

        Defendant.

James K. Vucinovich
Benjamin T.G. Nivison
ROSSI VUCINOVICH PC
1000 S.W. Second Avenue, Suite 1610
Seattle, Washington 98104

        Attorneys for Plaintiff

Timothy J. Coleman
W.S. Tab Wood
COSGRAVE VERGEER KESTER LLP
888 S.W. Fifth Avenue, Suite 500
Portland, Oregon 97204

/ / /

1 - OPINION & ORDER

Steve Densley
280 S. 400 W., Suite 250
Salt Lake City, Utah 84101

     Attorneys for Defendant

HERNANDEZ, District Judge:

     In this employment action under the Federal Rail Safety Act, 49 U.S.C. § 20109 (FRSA), Plaintiff Andrea Thomas alleges that her former employer, Defendant Union Pacific Railroad Company, terminated her in retaliation for filing a workplace injury report. Plaintiff moves for partial summary judgment and Defendant moves for summary judgment. I grant Plaintiff's motion in part and deny Defendant's motion.

## BACKGROUND

     Plaintiff worked for Defendant from April 2013 to August 4, 2014. She completed classroom training and then began conductor training. After completing remote control training, she worked off the "extra board" in Hinkle, Oregon, meaning she was one of several employees who, on a rotating basis, filled in when a regular employee was absent.

     Plaintiff alleges that on March 22, 2014, she sustained a hearing loss injury when she was exposed to a very loud and unexpected noise from a locomotive. She was walking past the locomotive when, she states, the air dryer expelled a very loud, popping noise into her ear as she passed by. She alleges that she has had continuous ringing in her ear since that time. Within a few days of the incident, she started noticing some hearing difficulty and occasional dizziness. At the time, Plaintiff had a cold or sinus infection and was not sure if her symptoms were related to her cold or if she had an actual injury from the noise exposure.

     Plaintiff went to an ear, nose, and throat (ENT) physician on April 17, 2014 who she

2 - OPINION & ORDER

asserts diagnosed her with tinnitus and a traumatic hearing loss in her left ear.  She immediately called Defendant to report her injury.  Her union representative told her that the correct injury reporting protocol was to contact Bryan Clark, the Director of Terminal Operations at Hinkle. Plaintiff called Clark.  She states that he asked her several questions and then instructed her to come in at the beginning of her shift that day to complete a report.

Plaintiff asserts that in working with Clark to complete her injury report, he (1) refused to allow Plaintiff to have a co-worker with her while completing the report; (2) questioned the nature of her injury, including whether she was sure it was a one-time traumatic incident and not the result of cumulative exposure; (3) told her that based on her description, she could not have suffered the injury she was reporting; (4) told her that the piece of equipment that she alleges injured her was a spitter valve, not an air dryer; (5) refused to allow her to use a computer to confirm the date of the incident, which Plaintiff could not remember accurately; and (6) intimidated her by making various statements, including telling her that there were "repercussions" for falsifying a Federal Railroad Administration (FRA) document, that the railroad would "get to the bottom of this," and knew "how to handle people like this," and further calling her a "liar" for trying to falsify a FRA document.

According to Plaintiff, within a week after submitting her initial injury report on April 17, 2014, she confirmed with another employee that the locomotive appliance that had injured her was in fact an "air dryer," not a "spitter valve," and she independently confirmed the date of the incident as March 22, 2014.  She alleges that after several attempts to contact Clark to correct her injury report, he finally responded and told her that she would be committing a FRA violation for falsifying a report.  She was told by a different manager that she could go to Clark's office and

supplement her report at her next shift, which she did. She contends that Clark refused to give her a copy of the supplemental report.

Plaintiff alleges that after she reported her injury, she was subject to hostile and intense scrutiny from management. She was repeatedly questioned about her personal protective equipment, as well as "pop tested" and "road block tested." She observed two managers, Clark and John Carbage, watching her through binoculars. She alleges that Clark once followed her for her entire shift. Two other managers also followed her.

Plaintiff alleges that on April 19, 2014, two days after she reported her injury to Clark, he emailed his supervisors stating that as he researched her alleged hearing loss incident, he was finding discrepancies such as an incorrect report of the injury date. He specifically requested that he be allowed to charge Plaintiff with dishonesty in reporting her injury and to terminate her. He was told he could not terminate her because given the injury report, a termination too close to the date of the injury report could be considered "a whistleblower issue." Clark admitted that he was highly suspicious of Plaintiff's report of injury and thought it was fraudulent.

In July 2014, two months after the injury report, Clark investigated Plaintiff for dishonesty in reporting her end-of-shift time (referred to as the "tie up procedure"), on select occasions in June and July 2014. Clark sought permission from his supervisors to charge Plaintiff for dishonesty. On August 4, 2014, Defendant terminated Plaintiff for dishonesty in connection with the investigation initiated by Clark regarding her tie up time.

STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The

moving party bears the initial responsibility of informing the court of the basis of its motion, and

identifying those portions of "'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence

of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting

former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine

issue of material fact, the burden then shifts to the nonmoving party to present "specific facts"

showing a "genuine issue for trial." Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927-28

(9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the

pleadings and designate facts showing an issue for trial. Bias v. Moynihan, 508 F.3d 1212, 1218

(9th Cir. 2007) (citing Celotex, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. Suever v.

Connell, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the

light most favorable to the nonmoving party. Earl v. Nielsen Media Research, Inc., 658 F.3d

1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the

existence of a material issue of fact implausible, that party must come forward with more

persuasive evidence to support his claim than would otherwise be necessary. Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## DISCUSSION

I. Applicable Law - FRSA

Under the relevant section of the FRSA,

(a) In general.--A railroad carrier engaged in interstate or foreign commerce, . . .

may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done, . . . --

* * *

(4) to notify, or attempt to notify, the railroad carrier or the Secretary of Transportation of a work-related personal injury or work-related illness of an employee[.]

49 U.S.C. § 20109(a)(4).  An action brought for a violation of the FRSA is governed by the rules and procedures set forth in 49 U.S.C. § 42121(b) ("AIR-21"), an analogous statute governing airline employees.  42 U.S.C. § 20109(d)(2).

Claims under the FRSA, as governed by AIR-21, are adjudicated under a burden-shifting framework similar to that used in many other employment discrimination and retaliation statutes but possessing some unique distinctions.  First, Plaintiff must make out a prima facie case of retaliatory discrimination.  Van Asdale v. Int'l Game Tech., 577 F.3d 989, 996 (9th Cir. 2009) ("Section 42121(b)(2)(B), in turn, sets forth a burden-shifting procedure by which a plaintiff is first required to make out a prima facie case of retaliatory discrimination").  To establish a prima facie case, Plaintiff must prove the following elements by a preponderance of the evidence:  (1) she engaged in statutorily-protected activity; (2) the employer knew she engaged in a protected activity; (3) she suffered an unfavorable personnel action; and (4) her protected activity was a contributing factor in the unfavorable personnel action.  Araujo v. N.J. Transit Rail Ops., Inc., 708 F.3d 152, 157 (3d Cir. 2013); see also Tamosaitis v. URS Inc., 781 F.3d 468, 481 (9th Cir. 2015) (reciting same elements as required to establish a prima facie case of retaliation under the Energy Reorganization Act and citing Araujo in support).

The Araujo court explained the FRSA retaliation law as follows:

The purpose of the [FRSA] is "to promote safety in every area of railroad operations." 49 U.S.C. § 20101. The FRSA was substantially amended in 2007 to include anti-retaliation measures. . . . .Congress passed the FRSA amendment in 2007, expanding the scope of the anti-retaliation protections and providing enforcement authority with the Department of Labor. . . . .

The FRSA incorporates by reference the rules and procedures applicable to Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR–21") whistleblower cases. Id. § 20109(d)(2)(A). AIR–21 sets forth a two-part burden-shifting test. See id. § 42121(b)(2)(B)(i)-(ii). . . . .

* * *

Considering the plain meaning of the statute, FRSA burden-shifting is much more protective of plaintiff-employees than the McDonnell Douglas framework. The plaintiff-employee need only show [as part of his or her prima facie case] that his protected activity was a "contributing factor" in the retaliatory discharge or discrimination, not the sole or even predominant cause. See 49 U.S.C. § 42121(b)(2)(B)(ii). In other words, a contributing factor is any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision.

Araujo, 708 F.3d at 156-58 (internal quotation marks, citations, footnotes omitted).

Once the plaintiff establishes his or her prima facie case, the burden shifts to the employer to demonstrate "by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior." 49 U.S.C. § 42121(b)(2)(B)(ii); see also Van Asdale, 577 F.3d at 996 (if the plaintiff meets his or her burden, "the employer assumes the burden of demonstrating by clear and convincing evidence that it would have taken the same adverse employment action in the absence of the plaintiff's protected activity."). The clear and convincing standard is a higher burden of proof than used in many other employment discrimination and retaliation statutes.

The Araujo court further explained that

[i]t is worth emphasizing that the AIR–21 burden-shifting framework that

is applicable to FRSA cases is much easier for a plaintiff to satisfy than the
McDonnell Douglas standard. As the Eleventh Circuit noted in a case under the
Energy Reorganization Act, 42 U.S.C. § 5851, a statute that uses a similar
burden-shifting framework, "[f]or employers, this is a tough standard, and not by
accident." Stone & Webster Eng'g Corp. v. Herman, 115 F.3d 1568, 1572 (11th
Cir. 1997). The Eleventh Circuit stated that the standard is "tough" because
Congress intended for companies in the nuclear industry to "face a difficult time
defending themselves," due to a history of whistleblower harassment and
retaliation in the industry. Id. The 2007 FRSA amendments must be similarly
construed, due to the history surrounding their enactment. We note, for example,
that the House Committee on Transportation and Infrastructure held a hearing to
"examine allegations . . . suggesting that railroad safety management programs
sometimes either subtly or overtly intimidate employees from reporting
on-the-job-injuries." (Impact of Railroad Injury, Accident, and Discipline Policies
on the Safety of America's Railroads: Hearings Before the H. Comm. on
Transportation and Infrastructure, 110th Cong. (Oct. 22, 2007)).

Araujo, 708 F.3d at 159.

In summary, while the burden-shifting concept is familiar, the "causation" element of

Plaintiff's prima facie case is less onerous under FRSA and the burden on Defendant to show it

would have taken the same action anyway is by clear and convincing evidence, a higher burden

of proof than required under other retaliation statutes.

II. Plaintiff's Motion for Partial Summary Judgment

Plaintiff moves for partial summary judgment on the following issues: (1) that she filed a

report of on-duty personal injury related to her workplace injury of March 22, 2014; (2) that

Defendant was aware of her injury report; (3) that her injury report filing was a "protected

activity" under § 20109(a)(4); and (4) that she suffered an adverse personnel action when she was

discharged on August 4, 2014. Defendant argues that there are disputed issues of material fact as

to whether the injury report filing was a "protected activity" under FRSA. Defendant then argues

that because disputed material facts exist on that issue, the remaining issues raised by Plaintiff

8 - OPINION & ORDER

are immaterial.

A. Protected Activity

The statute requires that the employee's act (meaning here, the notice of a workplace injury), must be done in "good faith." 49 U.S.C. § 20109(a). Defendant argues that both subjective and objective good faith are required. Defendant contends that the evidence in the record creates an issue of material fact regarding whether Plaintiff's report was made in good faith and thus, there is an issue of material fact as to whether the report is protected conduct which is required to form the basis of a retaliation claim.

Plaintiff argues that the statute requires only subjective good faith. She contends that the evidence conclusively establishes that she reported her injury with the subjective belief that she was injured at work. I agree with Defendant that when the evidence is considered in a light most favorable to it, reasonable jurors could conclude that the air blast from the locomotive never occurred and that Plaintiff fabricated the incident. This in turn could cause reasonable jurors to conclude that Plaintiff actually lacked subjective good faith when she filed her injury report. Because of my conclusion on the subjective good faith issue, I need not resolve at this juncture the legal question of whether objective good faith is also required to establish that Plaintiff's report is protected activity.

In support of her contention that her report of her injury was in good faith, Plaintiff relies primarily on her deposition testimony. Vucinovich May 17, 2016 Decl. Ex. 1 ("Pl. Dep.") 68:9-15; ECF 41-1 (claiming hearing loss caused by loud noise she was exposed to on the job); Id. at 78:19-80:7 (describing having something expelled as she was passing her locomotive which made an extremely loud sound the way an air dryer would expel but much greater and indicating

it was like a sound she had heard before but "[e]xtremely louder"); Id. at 80:16-24 (stating that

she was standing "so close" to whatever the sound was and stating it was "one very loud

expulsion of extreme sound"); Id. at 85:18-21 (the noise sent a sensation through her ear and

head); Id. at 86:23-25 (head stopped hurting but ear was ringing significantly after that); Id. at

88:12-20 (ear ringing has continued to date of deposition; ringing was significant); Id. at 88:25-

89:18 (mentioned incident on day it occurred in break room to inquire if such a noise was

normal; Greg DeMaster one of the people in the room); Id. at 90:23-91:6 (within two days started

to feel dizzy from time to time and was not hearing as well); Id. at 92:1-25 (a couple of weeks

later daughter's primary care physician looked at her ear which was feeling plugged and not

getting better; she was told it looked clear and there was nothing wrong; saw ENT Dr. Ronald

Schwartz on April 17, 2014); Id. at 99:8-100:1-20 (did not report the injury at the time it

occurred because did not realize she was hurt until her doctor confirmed it for her; was hoping

she had only an ear infection; had no idea what was wrong; she knew she had been exposed to

this extremely loud sound and had severe ringing that did not go away but did not know it was an

injury until her doctor confirmed it); Id. at 100:22-24 (reported it immediately after seeing Dr.

Schwartz); Id. at 101:1-5 & 101:14-16 (called union representative first and learned she needed

to contact Clark; she immediately called Clark to state that she was just diagnosed with a hearing

issue related to an injury she had had at work and needed to report it).

 In addition, her April 17, 2014 injury report is in the record.  Densley June 7, 2016 Decl.

Ex. 7; ECF 48 at 39-40.  There, she states that she was walking past the power units and the

"spitter valve" went off causing extreme pain to her left inner ear and throughout her head.  Id.

She described the nature of her injury as severe hearing loss in her left ear with severe ringing.

Id.

This evidence is sufficient to initially demonstrate that at the time she filed her injury report, Plaintiff subjectively believed that she was injured by a work-related noise.  See Koziara v. BNSF Ry. Co., No. 13-cv-834-jdp, 2015 WL 137272, at *7 (W.D. Wis. Jan. 9, 2015) (explaining that the record contained evidence of the plaintiff's subjective belief that his injury was work-related because the defendant did not dispute the basic nature of the accident or that a doctor diagnosed him with a fractured tibia; further noting that the injury report submitted by the plaintiff to the defendant was "also evidence of his subjective belief" because the plaintiff described his injury as a fractured tibia and he identified the incident at work as the cause), appeal filed, No. 16-1577 (7th Cir. Mar. 15, 2016).  Here, Defendant does not dispute that Plaintiff suffered hearing loss or the other symptoms she reported.  While Defendant challenges the cause, it does not dispute that she experienced a headache, tinnitus, or a  hearing loss at the time she reported the injury.[1]

Defendant argues that evidence in the record undermines the determination, on summary judgment, that at the time she filed her report Plaintiff had a subjective belief that her hearing loss was from a work incident.  Defendant points to the following:  (1) Plaintiff was suffering a cold or sinus infection at the time; (2) Plaintiff saw her doctor only a few days after the alleged noise exposure incident at work but failed to mention any hearing loss or ear-related issues; (3) Plaintiff delayed in reporting the incident; (4) DeMaster testified that contrary to Plaintiff's

---

[1]  In its Reply in support of its own motion for summary judgment, Defendant states that it disputes Plaintiff's claim of hearing loss for purposes of Plaintiff's motion for summary judgment.  As I read the briefing, however, I understand Defendant's argument in response to Plaintiff's motion to dispute the cause of her hearing loss but not the fact that she had  hearing loss.

testimony, he does not recall learning about the incident from Plaintiff until April 17, 2014 when she formally reported it; (5) the incident occurred in March 2014, not a full month earlier in February 2014 as she initially reported to Clark and also reported to ENT Dr. Schwartz when she saw him on April 17, 2014; (6) earlier medical records show that in 2008, she had complaints of left hearing loss and tinnitus and a diagnosis of Meniere's Disease; (7) Dr. Schwartz's records note the history of her present illness as having developed an upper respiratory infection two months earlier, which Plaintiff described as a "bad cold"; Plaintiff reported to Dr. Schwartz that at about the same time, "in mid February 2014" there was a release of air pressure from the train which caused severe pain in her ear; Dr. Schwartz assessed that it was "difficult to know" whether her moderate left hearing loss was "related to the acoustic trauma or the upper respiratory infection that she had"; and (8) the expert report of Defendant's ENT who opines that the noise exposure on March 22, 2014 did not cause any injury to her ear.[2]

Although Plaintiff has her own interpretation of these facts and argues that the facts are consistent with her subjective belief that the noise incident at work caused her hearing loss, this is Plaintiff's motion for summary judgment and thus, I must view these facts in a light most favorable to Defendant.  Considered in this vein, a reasonable juror could conclude that Plaintiff had a preexisting hearing loss since 2008, or preexisting as a result of a cold or sinus infection since February 2014, and that knowing her hearing loss was not caused at work, Plaintiff nonetheless filed a work injury report falsely claiming the hearing loss occurred as a result of a

---

[2]  Plaintiff objects to the admission of this evidence because the cause of her injury is not relevant to whether she subjectively believed at the time that her hearing loss was in whole or in part attributable to the air blast from the train.  I agree with Plaintiff and therefore, do not consider the expert report in connection with the "protected conduct" issue.

noise incident on the job.  When considered collectively and in a light favorable to Defendant, the facts could be reasonably interpreted as supporting this theory because there were no witnesses to the incident, DeMaster does not recall hearing about it before Plaintiff's formal report, Plaintiff failed to report the hearing loss to her own doctor only a few days later, she inconsistently reported the date of the incident, and she delayed in reporting it.  These facts create an issue as to whether Plaintiff actually subjectively believed her hearing loss was caused by a noise incident at the workplace.  Accordingly, because there is an issue as to Plaintiff's "good faith," I deny summary judgment to Plaintiff on the issue of whether her work injury report was protected conduct within the meaning of § 20109(a).

B.  Remaining Issues in Plaintiff's Motion

As noted above, in addition to moving for summary judgment on the issue of whether her injury report filing was "protected activity" under § 20109(a), Plaintiff moves for partial summary judgment on the following issues:  (1) she filed a report of on-duty personal injury related to her workplace injury of March 22, 2014; (2) Defendant was aware of her injury report; and (3) she suffered an adverse personnel action when she was discharged on August 4, 2014.

Defendant does not dispute that Plaintiff filed a work injury report, that it was aware of that report, or that it terminated her.  Nonetheless, Defendant argues against summary judgment for Plaintiff on these issues because without a finding that the injury report was protected conduct, Defendant believes that these other issues are immaterial.  At oral argument, Defendant also expressed a concern which may be characterized as based on semantics.  Defendant, relying on the elements of the prima facie case, contends that without a finding that the work injury report was protected conduct, the court cannot rule that the employer knew that she engaged in

protected activity or that she suffered an unfavorable personnel action. In Defendant's view, a finding that Plaintiff's termination was an "unfavorable" or "adverse" employment action in the absence of a finding that Plaintiff's conduct was in fact protected, suggests it did something wrongful when it did not.

Defendant's argument is unavailing. First, Plaintiff's motion is specific in seeking summary judgment on the issue that she filed a report of on-duty personal injury related to her workplace injury of March 22, 2014, on the issue that Defendant was aware of that injury report, and on the issue that her August 4, 2014 termination was an adverse personnel action. As framed by Plaintiff, these issues do not carry an implication or any hidden meaning that the workplace injury report was protected conduct or that Defendant acted improperly. That is, a determination now that she filed a workplace injury report for an injury occurring on March 22, 2014 is nothing more than confirmation of a fact that Defendant does not dispute. Nor does Defendant dispute that it knew of her workplace injury report. And, an involuntary termination is always adverse to the employee. The fact that an involuntary termination occurred does not imply that the termination was wrongful under the FRSA.

Second, I reassure Defendant that my granting summary judgment to Plaintiff on these three issues does not imply in any way that Plaintiff's workplace injury report was protected conduct. That issue remains unresolved and will be put to the jury. Without a determination that the report was protected conduct, the remaining issues on which Plaintiff seeks summary judgment exist in isolation and cannot establish a prima facie case or suggest wrongdoing. Given that Defendant does not dispute the facts on these issues, it is appropriate to grant Plaintiff's motion other than as to the protected conduct issue.

14 - OPINION & ORDER

III.  Defendant's Motion for Summary Judgment

Defendant moves for summary judgment arguing that as a matter of law, Plaintiff cannot establish a prima facie case and even if Plaintiff can, Defendant has established by clear and convincing evidence that it would have made the same decision to terminate Plaintiff in the absence of protected activity.

A.  Prima Facie Case

Defendant challenges the third and fourth elements of Plaintiff's prima facie case:  that she suffered an unfavorable personnel action and that her protected activity was a contributing factor in the unfavorable personnel action.  Araujo, 708 F.3d at 157.

1.  Unfavorable Employment Action[3]

The third element of the prima facie case requires Plaintiff to establish that she suffered an "unfavorable" personnel action.  Id.  Defendant contends that although Plaintiff relies on several adverse actions, only the termination is a sufficient unfavorable employment action. Plaintiff argues that Defendant erroneously characterizes her claim.  She does not contend that each type of conduct directed at her after she filed her report is a separate adverse action.  Rather, she argues that her allegations must be viewed in their entirety, not in isolation, and are evidence of a pattern of conduct in violation of the FRSA.

_____

[3]  Defendant relies on an Eighth Circuit case for the proposition that Plaintiff must have suffered an "adverse" employment action.  Def.'s Mem. 10 (citing Kuduk v. BNSF Ry. Co., 768 F.3d 786, 789 (8th Cir. 2014)); ECF 38.  Araujo uses the term "unfavorable."  Plaintiff does not make an issue of the different terminology - meaning the use of "adverse" instead of "unfavorable."  As indicated above, the Ninth Circuit has favorably cited Araujo for prima facie standards in a similar retaliation statute, suggesting it would use the term "unfavorable." However, given that the parties appear to use the terms interchangeably, I do not address whether the use of one term instead of the other is material.

In non-FRSA cases in the Ninth Circuit, the phrase "adverse employment action" in a retaliation case is given an "expansive view" such that "an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity." Ray v. Henderson, 217 F.3d 1234, 1241, 1243 (9th Cir. 2000). As the Ninth Circuit explained in a 2004 case, "the universe of potential adverse employment actions for retaliation claims is larger than the universe of potential tangible employment actions that can subject an employer to vicarious liability for harassment." Elvig v. Calvin Presbyterian Church, 375 F.3d 951, 965 (9th Cir. 2004). Thus, in Elvig, the court held that "retaliatory harassment can be an adverse employment action giving rise to a retaliation claim." Id.

In 2006, the Supreme Court explained in a Title VII case that the "language of the substantive [discrimination] provision [of Title VII] differs from that of the anti-retaliation provision in important ways." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 61 (2006). The substantive provision is limited "to actions that affect employment or alter the conditions of the workplace." Id. at 62. Without that limitation, the retaliation provision encompasses a broader array of conduct. E.g., Wilson v. Oregon, No. 3:11-cv-01061-PK, 2013 WL 6196983, at *15 (D. Or. Nov. 27, 2013) (definition of an "adverse employment action" in the Title VII retaliation context is broader than that used to determine supervisor vicarious liability; in the retaliation context the term means "an action that is 'materially adverse' and that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination'") (quoting Burlington Northern, 548 U.S. at 68).

Additionally, while the definition of adverse employment action in a retaliation claim is already broader than in a substantive discrimination claim under Title VII and similar statutes, in

16 - OPINION & ORDER

the context of FRSA, "adverse action" is even more expansively construed.  In a 2015 case, the

Administrative Review Board (ARB) of the United States Department of Labor which

adjudicates FRSA retaliation cases under AIR-21, sought to clarify the meaning of "adverse

employment action" in a FRSA case.  Fricka v. Nat'l R.R. Passenger Corp., ARB No. 14-047,

2015 WL 9257754, at *3-4 (ARB Nov. 24, 2015).  Fricka relied on a 2010 case which held that

"'adverse actions refer[] to unfavorable employment actions that are more than trivial, either as a

single event or in combination with other deliberate employer actions alleged.'"  Id. at *4

(quoting Williams v. Am. Airlines, Inc., ARB No. 09-018, ALJ No. 2007-AIR-004 (ARB Dec.

29, 2010)) (emphasis added).  The ARB noted that like FRSA, the similar statutory language of

Sarbanes-Oxley "explicitly proscribed non-tangible activity."  Id. at *3.

> The Fricka decision explained that
>
> FRSA, which prohibits "discharg[ing], demot[ing], suspend[ing], reprimand[ing],
> *or in any other way discriminat[ing]* is virtually identical to the relevant broad
> statutory language in [Sarbanes-Oxley] ("in any other manner discriminat[ing]")
> and even broader than that of AIR 21.  Further, in Vernace v. Port Auth.
> Trans-Hudson Corp., ARB No. 12-003, ALJ No. 2010-FRS-018 (ARB Dec. 21,
> 2012), we agreed with the ALJ's reliance on Williams, ARB No. 09-018, in a
> FRSA case. We noted that "Congress re-emphasized the broad reach of FRSA
> when it expressly added 'threatening discipline' as prohibited discrimination in
> section 20109(c) of the FRSA statute."

Id. at *4 (footnote omitted); see also id. at *2 n.24 ("We note that neither the FRSA statute nor

the regulations limit the proscribed action to 'compensation, terms, privileges, and conditions of

employment,' like many of the whistleblower statutes under our delegation of authority do.  Thus,

the FRSA statute and regulations appear to be very broad in their conception of what 'adverse

action' is.").

In this case, Plaintiff alleges that following her workplace injury report on April 17, 2014,

she was subject to (1) intimidating and harassing interviews by Clark and Max Morante,

Defendant's Manager of Terminal Operations; (2) increased surveillance by Defendant's

employees; (3) increased employee testing; (4) discipline for a pattern of absenteeism; and (5)

dismissal.  Defendant cites cases indicating that investigative interviews standing alone or

employer surveillance are not considered adverse action in retaliation cases.  However, many of

the cases Defendant relies on are not FRSA cases with the expanded concept of unfavorable or

adverse employment action.  Additionally, these cases are enormously fact-dependent.  The facts

here, which on this motion must be examined in a light most favorable to Plaintiff, could support

an inference that Clark was out to terminate her from the beginning.  For example, Clark's

behavior during the meeting on April 17, 2014 when Plaintiff met with him to complete her

initial injury report included not letting Plaintiff have a co-worker present, not letting her verify

the date of the incident, telling her that her symptoms were the result of cumulative events rather

than a single traumatic incident, and warning her about the repercussions for filing a false report.

These facts could suggest that this meeting was more than just an "investigative interview."

While Fricka is not binding here, it recognizes the broad language of FRSA.  Given the

Ninth Circuit's expansive view of retaliatory "adverse employment actions" in Title VII cases,

and the even more expansive language in FRSA, I believe the Ninth Circuit would rule

consistently with Fricka and conclude that non-tangible activity is included in the definition if it

is unfavorable and non-trivial, either "as a single event or in combination with other deliberate

employer actions alleged."  Fricka, 2015 WL 9257754, at *3.

Furthermore, although the Ninth Circuit has made the following observation in the

context of discussing the causation element of a retaliation claim and not the adverse

18 - OPINION & ORDER

employment action element, it has expressly recognized "patterns of antagonism." E.g., Porter v. Cal. Dep't of Corrs., 419 F.3d 885, 895 (9th Cir. 2005) (noting that while "a lack of temporal proximity may make it more difficult to show causation, circumstantial evidence of a pattern of antagonism following the protected conduct can also give rise to the inference") (internal quotation marks omitted); Ogawa v. Malheur Home Tel. Co., No. CV 08-694-MO, 2010 WL 1542559, at *5 (D. Or. Apr. 14, 2010) (concluding that the antagonistic conduct the plaintiff experienced from the time of his reinstatement to the time he quit his employment was sufficient to raise an inference of causality for purposes of his retaliation claim).

When the record is viewed in Plaintiff's favor, a reasonable juror could conclude that Defendant's actions before termination could have had a chilling effect on protected activity, were unfavorable, and were more than trivial. Thus, even when these incidents are viewed in isolation, there are issues of fact as to whether they are "adverse employment actions" under FRSA. Moreover, whether each of those three acts is a separately cognizable adverse employment action is immaterial because they are properly viewed, when considering the facts in a light most favorable to Plaintiff, as evidence of a pattern of harassing or antagonistic conduct which culminated in termination.

### 2. Protected Activity as a Contributing Factor in Plaintiff's Termination

Defendant moves against the "causation" element under which Plaintiff must establish that her protected activity was a contributing factor in her termination. Araujo, 708 F.3d at 157. As to this element in particular, as I noted above, the Araujo court explained that the

> FRSA burden-shifting is much more protective of plaintiff-employees than the McDonnell Douglas framework. The plaintiff-employee need only show that his protected activity was a "contributing factor" in the retaliatory discharge or

19 - OPINION & ORDER

> discrimination, not the sole or even predominant cause.  See 49 U.S.C. §
> 42121(b)(2)(B)(ii).  In other words, a contributing factor *is any factor, which
> alone or in combination with other factors, tends to affect in any way the outcome
> of the decision*.

Id. (internal quotation marks omitted; emphasis added); see also Ameristar Airways, Inc. v.

Admin. Review Bd., U.S. Dept. of Labor, 650 F.3d 562, 567 (5th Cir. 2011) (same).  Moreover,

an employee need not demonstrate the existence of a retaliatory motive on the part of the

employer.  Araujo, 708 F.3d at 158-59, 161.

Defendant argues that Plaintiff cannot establish the causal element of her prima facie case

because she has no direct evidence of discrimination and the termination is too remote from the

date she submitted her injury report to raise an inference of causation by relying on temporal

proximity.  I disagree.

First, there is no requirement that Plaintiff have direct evidence of causation.  Araujo, 708

F.3d at 161 ("direct evidence is not required").  Second, the discussion in the previous section

cites cases in which the Ninth Circuit and this Court have found an inference of causation based

the employer's pattern of harassing or antagonistic conduct.  Thus, if the timing between the

April 17, 2014 injury report and the August 4, 2014 termination is too remote to allow for a

causation inference based on temporal proximity, Plaintiff can defeat Defendant's motion by

showing a pattern of harassing conduct beginning closer to the date of her protected conduct.

According to Defendant, Plaintiff was terminated because of falsifying her "tie up" time

which is the railroad industry's vernacular for what is more commonly referred to as "clocking

out."  As noted above, Plaintiff worked off of the "extra board," also referred to as the "guarantee

board" out of Hinkle.  This is a list of employees who have chosen to work on-call shifts.  These

employees are guaranteed some minimum pay regardless of how much or how little they worked during the month.  As Clark explains it, the order in which guarantee-board employees are called to work is determined by the time the employee "ties up" on the previous work day.  Id., Ex. K (Clark Affid.) ¶ 6.  The later an employee ties up, the greater the chance the employee will receive overtime for that pay period.  Id.  And, the later an employee ties up, the greater the chance that others will tie up first and consequently, others on the same board may get called in to work first, and work more, but get the same pay as the employee who is working less because there is a guaranteed minimum amount of pay.  Id. ¶ 7.

Clark contends that on July 8, 2014, one of Plaintiff's co-workers told him that Plaintiff had been tying up much later than her fellow crew members.  Id. ¶ 10.  Clark does not name this employee.  Id.  Clark then checked Plaintiff's employment records and found that she tied up that day about fifty-three minutes after the rest of the crew had already tied up.  Id. ¶¶ 11, 12.  He also discovered that she had been tying up between twelve and sixty-seven minutes after the rest of the crew members on eight occasions between June 1, 2014 and July 8, 2014.  Id. ¶ 12.  According to Clark, tying up behind others on the same board put Plaintiff in a position to work less than her peers and still collect guarantee pay and overtime pay.  Id. ¶ 15.  Clark asserts that purposefully tying up behind employees after one is released from duty constitutes falsification of the tie up records required by the FRA.  Id. ¶ 17.

Clark signed a Notice of Investigation dated July 10, 2014, instructing Plaintiff to report to a hotel in Hermiston on July 14, 2014 (later changed to July 25, 2014) for an investigation and hearing to develop facts and determine responsibility for dishonesty in reporting her tie up time.  Def.'s Mem., Ex. C; ECF 38-3; see also Id., Ex. C; ECF 38-1 (hearing transcript).  On August 4,

21 - OPINION & ORDER

2014, the charges against Plaintiff were sustained and she was terminated.  Id., Ex D; ECF 38-4.

Plaintiff argues that there was temporal proximity between her injury report and animus and harassment from Clark given that Clark immediately started questioning her injury and its cause at the time she made the report.  Pl. Dep. 102-110 (Clark refused to allow co-worker to accompany Plaintiff; Clark challenged her as to whether injury was the result of cumulative exposure; Clark insisted the part causing her injury was a spitter valve even though Plaintiff told him she thought it was an air dryer; Clark refused to allow Plaintiff to check the computer records to determine the correct date of the incident; Clark told her there were repercussions for falsifying a FRA document; Clark made a mention that the "railroad would get to the bottom of it" and "they know how to handle people like this"; Clark slammed down the phone at one point; Clark told her she needed to hurry up; Clark insisted her injury could not have occurred the way she reported it).

Two days after Plaintiff reported her work injury to Clark, Clark sent an email to William Meriwether and Robert Schafer with the subject line "New Information on the Alleged AL Thomas Hearing Loss Incident."  Dep.  Ex. 15 to Pl. Dep., submitted by Pl. in Resp to Def's MSJ; ECF 41-2 at 33.  In that email, Clark explained that as a result of his "research further into the alleged AL Thomas hearing loss incident," he was "finding more discrepancies."  Id.  He noted that "[b]esides what we have already discussed in prior conversations," he was unable to find matching work histories for Plaintiff and DeMaster, the person Plaintiff said she had been working with on the date the incident occurred.  Id.  On May 2, 2014, Clark sent another email to Meriwether and Schafer, as well as to "L. Pat Bonneville" further detailing his investigation into Plaintiff's injury report.  Id. at 38.

Then, on May 8, 2014, Clark sought permission from Meriwether to charge Plaintiff with dishonesty as well as other infractions.  Id. at 42.  Meriwether responded that "Shane" was not ready to make a decision.  Id. at 43.  Clark followed up on May 13, 2016.  Id. at 45.  Meriwether's response was "No go.  We will talk later."  Id. at 46.  Clark responded "Understood."  Id. at 47.

There are a slew of emails from Clark to others in which he is pursuing the possibility of charging Plaintiff with dishonesty.  Id. at 33-71.  They are not submitted in any chronological order but it is clear that within one week of her report, Clark was already building a case of "major discrepancies" between what Plaintiff reported and what Clark asserted actually occurred. E.g., Clark April 24, 2014 email to Meriwether starting with "Pat, I have attached the documentation on AL Thomas below, . . . ." Id.  at 64-65.  Meriwether forwarded this email to Regional Vice-President Shane Keller on April 28, 2014 asking for five minutes of his time to discuss and noting "Possibly a 1.6" referring to a type of infraction.  Id.  Keller responded the next day to Meriwether, stating that the "claim about when it happened isn't as important as how it happened. . . . The issue here is her intent to mislead or lie and what portion of 'it must have happened here' is she certain of. . . . I'm not judging at this point, but at this point without asking her to answer specific questions the case looks like inconsistencies vs. an untruth."  Id. at 64.

In his deposition, Clark testified that he wrote a letter about Plaintiff's discrepancies and he was told that it was "too close to a whistleblower so leave it alone."  Pl. Mem. Ex. 2 (Clark Dep.) 157:3-12; see also id. 160:15-161:9 (Clark testified that he requested that Defendant look into charging Plaintiff with dishonesty based on the inaccuracies of what she reported and statements made by others; that a "1.6 charge" must be made to the superintendent and that there is usually a discussion with counsel and in this case, Clark learned that the "discussion" with

counsel was essentially that there were a lot of inaccuracies that did not add up but with this being in regard to an injury, it was too close to where it could potentially be considered a whistleblower issue).

Next, Plaintiff alleges that also within close proximity to her injury report, she began experiencing "inordinate" surveillance of her work by Defendant, including being followed throughout the entire course of her shift and being watched by officials through binoculars. She alleges there was an increase in scrutiny regarding her personal protective equipment and that she became subject to a substantial increase in testing while performing her job.  She did not experience this type of treatment before her injury report.[4] Pl. Dep. 118:11-18 (describing surveillance and testing); Id. at 120:4-13 (describing these actions as intimidating); Id. 120:18-20 (describing surveillance by Carbage and Clark); Id. 126:4-7 (describing these actions as calculated and harassing); Id. 126:18-19 (felt like she was being targeted); Id. 129:16-22 (describing how starting with reporting her injury, Clark's and Carbage's demeanor to her changed and circumstances were more hostile and intrusive; they were "holding" her "under a microscope every minute" and other people were not being treated this way).

Plaintiff also cites to deposition testimony by Clark in which he admits that he is unaware

---

[4]  Defendant notes that under federal regulations, it is required to establish a program of operational tests and inspections.  49 C.F.R. § 217.9.  Pursuant to this requirement, Defendant has a field testing program, referred to as "FTX" that evaluates employees' ability to follow safety rules and procedures, identify training needs, etc.  Plaintiff's FTX testing records show that she underwent performance testing zero to three times per month from July 2013 to June 2014.  Id.; Ex. J.  A close look at the records shows  no increased amount of FTX testing after April 17, 2014 when she filed her injury report.  Id.  But Plaintiff's testimony is that she was "pop tested" and "road block tested" more frequently after making her report, not that she was subjected to increased FTX testing.  Pl. Depo. 118.

of training procedures for tie ups and is unaware of any union agreements that govern when and

how to tie up. Clark Dep. 317:19-318:2; 318:14-320:23; 327:14-23; 329:11-21. Clark never

inquired of Plaintiff as to her understanding and training regarding tie up procedure. Id. 325:16-

326:4. He also never inquired about the actual tie up practice at Hinkle. Id. 329:22-330:2.

Moreover, Michael Jones a conductor for Defendant with thirty-eight years of experience,

who has knowledge of the applicable collective bargaining agreement from his capacity as an

elected union official, submits an affidavit explaining the training Plaintiff underwent and in

particular, her training on how to tie up. Jones Affid. 3; ECF 49. He states there are no written

rules, guidelines, or procedures provided by Defendant and the training does not establish a

maximum or minimum time in which to enter the tie up once your shift ends. Id. He also

explains that there are local work rules governing extra board employees, including a rule that

extra board employees are called to work in sequential order as they appear on the extra board -

the "first in first out rule." Id. at 3-4. Extra board employees are to be placed on the extra board

in the order called. Id. Other than Plaintiff, Jones can recall no one in the prior twenty years

working in the Hinkle yard or terminal who was accused or subjected to allegations of stealing

time related to tie ups. Id. at 4. Jones avers that in each of the alleged eight incidents alleged by

Clark establishing, in Clark's view, a pattern of dishonesty, Plaintiff was actually following local

rule, custom, and practice consistent with her training, and obtained no financial gain. Id.[5]

---

[5] Defendant moves to strike some of Jones's testimony. I deny the motion. First,
Defendant argues that Jones's testimony about the rules, regulations, and guidelines and his
opinion about whether Plaintiff was acting according to rules and regulations is inadmissible
because it is inconsistent with Rule 57 of the Collective Bargaining Agreement. But, Jones's
allegedly erroneous interpretation of that agreement does not make his testimony inadmissible. It
just makes it wrong. Next, Defendant argues that just because Jones cannot remember anyone in
twenty years who was charged for tie up rule violations does not mean that "it has not happened."

Finally, Clark admitted that a report of an on-duty injury becomes part of the safety record of the Portland Service Unit. Clark Dep. 181:20-25. Clark also testified that safety incidents such as on-duty injuries are part of the metrics for his individual performance criteria. Id. 186:20-25.

When the evidence is examined in a light most favorable to Plaintiff, it is more than sufficient to create an issue of fact on causation. Again, the standard is whether the injury report was a contributing factor, meaning whether it played any role even if there were other reasons. If Plaintiff's evidence is to be credited, from the moment she reported the injury, Clark was hostile to her and led the effort to find a basis to terminate her. Then, she was subject to increased surveillance and testing. Then, she was terminated for violations of rules which do not exist and according to her own and Jones's testimony, her tie up process was consistent with local custom and practice. As noted above, a pattern of antagonistic conduct, commencing soon after protected conduct, can establish causation, even if there is longer gap between the protected activity and termination. Here, the evidence can be interpreted to support a conclusion that

---

Def.'s Reply 10. This, however, is jury argument, not a basis for striking his testimony. Third, Defendant argues that when Jones offers his opinion that Plaintiff was acting consistently with the rules in the eight alleged instances of tie up violations, this is an "impermissible legal conclusion," improper "vouching for plaintiff's story that she was involved in company service at all times" and "is a conclusory opinion stated without sufficient foundation and based upon hearsay and is therefore not admissible." Id. I disagree. This is not a "legal" opinion but an opinion by a witness with familiarity and experience as to how the tie up rules work. Defendant is free to offer a witness who has a different interpretation of the rules and the jury can decide which interpretation is correct. That Jones's testimony is supportive of Plaintiff's claim does not make it improper vouching. And there is no hearsay expressly forming the basis of Jones's opinion that Plaintiff was performing company service, appropriately recording her tie up times, violated no rules, custom or practice, and gained no material or financial advantage. It is possible that Jones may have spoken to Plaintiff or reviewed documents. At this point, however, because Defendant does not provide a sufficient foundation for the hearsay objection, I do not consider it further.

26 - OPINION & ORDER

Defendant began treating Plaintiff unfavorably as soon as she reported a workplace injury. A reasonable juror could conclude that Clark was retaliating against her for filing the injury report, which, as he testified, becomes part of the safety record for the Portland Service Unit and affects his individual performance criteria. I deny Defendant's motion directed to the causation element of the prima facie case.

> B.    Defendant's Burden re:  Whether It Would Have Terminated Plaintiff Absent Protected Conduct

If Plaintiff establishes a prima facie case, the burden moves to Defendant to show by clear and convincing evidence, that it would have terminated Plaintiff absent her protected conduct. Defendant argues that even if I conclude that it is not entitled to summary judgment on Plaintiff's prima facie case, it is still entitled to summary judgment because it meets this burden as a matter of law. At least one court has noted that in a FRSA case, this argument is "often not suitable for summary judgment determination." Kuduk, 768 F.3d at 793.

Defendant relies on a 2016 District of Minnesota case for a list of "non-exclusive" factors by which to assess whether it would have made the termination decision absent Plaintiff's protected conduct. Dafoe v. BNSF Ry. Co., No. CV 14-239 (JRT/TNL), 2016 WL 778367, at *11 (D. Minn. Feb. 26, 2016) (citing Kuduk, 768 F.3d at 792, 793; Gunderson v. BNSF Ry. Co., No. 14-CV-0223 PJS/HB, 2015 WL 4545390, at *14 (D. Minn. July 28, 2015)). The factors as noted by the Dafoe court are:  (1) whether the railroad has written policies addressing the alleged misconduct; (2) whether the railroad followed applicable investigatory and disciplinary procedures; (3) whether the dismissal was "approved by others in senior management"; (4) whether the dismissal was upheld on appeal; (5) the "temporal proximity between the

27 - OPINION & ORDER

non-protected conduct and the adverse actions"; (6) whether the railroad consistently enforces the policies and rules at issue; and (7) "the independent significance . . . of the non-protected activity[.]" Id. (internal quotation marks omitted).

    1. Written Policies

Defendant has a written rule against dishonest behavior. But, Defendant has no written policies or procedures on the specific conduct at issue here. Clark cannot identify any written policies or procedures regarding employee tie ups and he cannot identify any written rule or policy for his determination that a twelve-minute discrepancy is the cut off for a reasonable amount of variance among employee tie up times. The regulation Defendant cites as relevant, 49 C.F.R. § 228.7, addresses "Hours of Duty" and governs the types of activities that are considered to be "on duty." It does not address the order in which railroad employees are supposed to "tie up" at the end of a shift. To the extent there are rules or regulations, they address the employee's obligation to tie up after each tour of duty, not the order in which employees tie up. Plaintiff notes that as described above, there is evidence that she was in fact following the instructions she was given in training and acted consistently with the collective bargaining agreement.

    2.    Following Applicable Investigatory and Disciplinary Procedures and Approval by Senior Management

There is no dispute that once the investigation into Plaintiff's tie up time was formally initiated, Defendant followed investigatory and disciplinary procedures.[6] The dismissal was

---

    [6] Plaintiff objects to the admission of the investigatory hearing transcript and the written appeal decision discussed in the next paragraph. I rely on these exhibits only to show that Defendant complied with investigatory procedures and that Defendant's decision was affirmed on appeal. Given their limited relevance to the summary judgment motions, I overrule Plaintiff's admissibility objections. If Defendant offers these as trial exhibits, Plaintiff may raise appropriate objections in a motion in limine.

approved by others in senior management.

### 3. Dismissal Upheld on Appeal

The decision to discipline Plaintiff was upheld on appeal by the Public Law Board (PLB). Def.'s Mem. Ex. E; ECF 38-5. Defendant argues that the PLB's approval of Defendant's dismissal decision shows that Defendant was not targeting Plaintiff for filing an injury report and supports the conclusion that Defendant would have fired her anyway for dishonest behavior. But, as Plaintiff notes, the PLB's review is not a de novo review and the PLB defers to the railroad's factual findings, including credibility findings. Id. Thus, while the dismissal was upheld, it does not establish as a matter of law on summary judgment that Defendant would have terminated Plaintiff absent her protected conduct.

### 4. Temporal Proximity

The temporal gap between when Clark learned about Plaintiff's tie up times and when Defendant notified Plaintiff of its investigation of her conduct was short. Plaintiff argues that the focus should be on the temporal proximity of the protected conduct and the pattern of harassment she received as a result. Although the Dafoe factor looks at the temporal proximity between the non-protected conduct and the termination, I agree with Plaintiff that a reasonable juror could conclude when viewing the evidence in a light most favorable to Plaintiff, that Clark began retaliatory and harassing conduct as soon as Plaintiff notified him she had suffered a workplace injury. Because, when viewed through this lens, a reasonable juror could conclude that Clark was already engaging in a pattern of harassment against her, the fact that he immediately began investigating Plaintiff's tie up time based upon the report of an unnamed co-worker, does not establish by clear and convincing evidence that Defendant would have terminated her absent her

protected conduct.

### 5.  Consistent Enforcement of Policies and Rules

Because there are no policies and rules regarding the order in which employees tie up, there is no evidence regarding their enforcement.

### 6.  Independent Significance of Plaintiff's Non-Protected Activity

Defendant argues that the independent significance of Plaintiff's dishonesty was substantial.  According to Defendant, Plaintiff's tie up times forced her fellow employees to work more for the same pay Plaintiff received for working less and allowed her to improperly collect overtime.  Jones provides contradictory evidence on these points, creating an issue of fact as to the significance of Plaintiff's tie up times.

The above analysis of the Dafoe factors shows that Defendant cannot meet its burden of establishing by clear and convincing evidence that it would have terminated Plaintiff absent her protected conduct.  Defendant does not have rules addressing the precise conduct Plaintiff was alleged to have abused.  The record contains evidence that she was following long-standing practice.  While the discipline was approved by others in senior management, those senior managers appear to have been part of a previous unsuccessful effort to fire her for filing a false injury report.  There is evidence of a pattern of harassment that began immediately upon Plaintiff's filing her injury report.  There are questions of fact as to how Plaintiff actually benefitted, if at all, from her allegedly improper tie up procedures.  When all of the evidence is considered in a light most favorable to Plaintiff, a reasonable juror could conclude that Defendant would not have terminated Plaintiff absent her having filed a workplace injury report.

/ / /

30 - OPINION & ORDER

CONCLUSION

Plaintiff's motion for summary judgment [39] is granted in part and denied in part.

Defendant's motion for summary judgment [37] is denied.

IT IS SO ORDERED.


Dated this _____ day of _____, 2016


Marco A. Hernandez
United States District Judge


31 - OPINION & ORDER